

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 6, 2014**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| R. L. ADKINS CORP., | § | Case No.  11-10241-RLJ-11 |
| | § | |
| Debtor. | § | |

## <u>MEMORANDUM OPINION</u>

Scott Oils, Inc. ("Scott Oils"), by its counsel, Kelly Hart & Hallman LLP ("Kelly Hart"),

filed its application requesting that Kelly Hart be awarded an administrative expense under

§ 503(b)(3)(D) and (b)(4) of the Bankruptcy Code (11 U.S.C.) for services provided in connection

with the confirmation of the chapter 11 plan of the Debtor, R.L. Adkins Corp. ("RLAC" or

"Debtor").  The Official Unsecured Creditors Committee ("Committee") and Harvey L. Morton,

Liquidating Trustee for the R.L. Adkins Corp. Liquidating Trust ("Trustee"), filed their joint

objection opposing the requested administrative claim.

By the application, Scott Oils requests that Kelly Hart be awarded a substantial contribution claim of $575,519.47. As discussed below, "substantial contribution" is the qualifying standard for an award of an administrative expense claim under § 503(b)(3)(D).

Upon careful consideration of the pleadings on the issue, the evidence presented, and arguments of counsel, the Court allows an administrative claim for Kelly Hart in the amount of $149,550.72.

The Court has jurisdiction over the issues raised here pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding under 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.

Scott Oils was the plan proponent on the chapter 11 plan that was ultimately confirmed by the Court on May 13, 2013 (the "Plan"). Its standing to propose a plan was gained by its purchase of three small unsecured claims in the case.[1] The Plan, and indeed the chapter 11 process, was used successfully by Scott Oils to purchase the mineral assets of RLAC. The Plan resulted from a contested confirmation hearing, with objections by the Trustee and the Committee, and multiple modifications of a plan originally proposed by Scott Oils. Though the implementation of the Plan has its complexities, the overall concept of the Plan is simple. By the Plan, Scott Oils purchased the Debtor's mineral interests for approximately $3.4 million; the plan originally filed by Scott Oils proposed a purchase price of $1 million. The Plan also incorporates a settlement and compromise of the major dispute in the bankruptcy case, which was between the Trustee (then serving as the

---

[1] Claim Nos. 121-1, 122-1, and 123-1, in the amounts of $7,284.98, $4,153.68, and $990.35, respectively.

chapter 11 trustee and standing in the shoes of the Debtor) and the so-called "Ardinger Group."[2] The Ardinger Group asserted secured claims of over $6 million and unsecured claims of over $36 million. The Trustee, standing in the Debtor's shoes, asserted various claims back against the Ardinger Group for over $98 million. The settlement resolved the disputes in full and includes the Ardinger Group's payment of $2.15 million to the estate and withdrawal of its secured and unsecured claims, as well as relinquishment of any claim to certain suspense funds of approximately $624,000. The consideration to the estate under the Plan—the $3.4 million and the $2.15 million—passes to the Trustee as a liquidating trustee charged with making disbursements to creditors. The Plan contains a complicated "waterfall" process and analysis through which mechanics and materialmen lien claims are paid.

Apart from its purchase of three relatively small claims as a means to provide it with standing to file a plan, Scott Oils' role was that of a purchaser under the Plan.

Though the application here is brought by Scott Oils, the substance of the request is by Kelly Hart to have its fees and costs paid by the Trustee out of the consideration received by the Trustee under the Plan. The basis, as stated at the outset, is that such services provided a "substantial benefit" to the estate.

## II.

Section 503(b)(3)–(4) of the United States Bankruptcy Code provides as follows:

> After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
> . . .

---

[2] The "Ardinger Group" is Horace T. Ardinger, Jr. (individually, and as the owner of the H.T. Ardinger, Jr. interests shown on the Debtor's books and records under owner numbers 11501 and 40011, and as the owner of the Horace Ardinger Special interests shown on the Debtor's books and records under owner number 11498), Mary L. Ardinger, HTA Minerals, LLC, H.T. Ardinger & Son, Co. (and as successor and survivor of Ardinger Land & Exploration Co., Inc.) and any of the foregoing parties' shareholders, officers, directors, members, managers, partners, employees, agents, trusts, estates, executors, administrators, trustees, heirs, descendants, devisees, family members, spouses, children, affiliates, parent companies, subsidiaries, representatives, and successors and assigns.

**(3)** the actual, necessary expenses, **other than compensation and reimbursement specified in paragraph (4) of this subsection**, incurred by—

    **(A)** a creditor that files a petition under section 303 of this title;

    **(B)** a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

    **(C)** a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

    **(D) a creditor**, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, **in making a substantial contribution in a case under chapter 9 or 11 of this title**;

    **(E)** a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

    **(F)** a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

**(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph** (A), (B), (C), **(D)**, or (E) **of paragraph (3) of this subsection**, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]

11 U.S.C. § 503(b)(3)–(4) (emphasis added).

The statutory provisions, as highlighted, raise two threshold issues, neither of which was addressed by the parties.

A.

First, a literal reading of the provisions implies that an applicant requesting a (b)(4)-claim (for, in the usual case, *reimbursement* of paid professional fees and expenses) have also a good (b)(3)-claim for expenses. Courts have, for the most part, rejected such a narrow view and have employed a more practical interpretation of the statute. *See In re Sedona Inst.*, 220 B.R. 74, 78 (B.A.P. 9th Cir. 1998); *In re Am. Plumbing & Mech., Inc.*, 327 B.R. 273, 277 (Bankr. W.D. Tex. 2005); 4 Collier on Bankruptcy ¶ 503.11[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). *But see Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 943 (3d Cir. 1994) (While the court did not specifically address the issue at hand, other courts have inferred the Third Circuit would

follow a literal reading of the statute.  The court noted that "§ 503(b)(4) authorizes awards of legal and accounting fees only in situations coming within the scope of § 503(b)(3) . . . .").

Though there are few cases specifically addressing this issue, courts that have analyzed and discussed it have noted that the strict reading could result in "absurd results" and that this is one of the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Sedona Inst.*, 220 B.R. at 78–79 (providing examples of the absurd results that could result from the literal interpretation); *Am. Plumbing & Mech.*, 327 B.R. at 279 (quoting *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)).

*In re Sedona Institute* provides the most thorough analysis of the statutory interpretation issue.  The panel there noted that many courts have awarded fees under § 503(b)(4) where there were no apparent § 503(b)(3) expenses, though none of those courts recognized or addressed the issue.  220 B.R. at 78.  Canvassing opinions of other courts, it determined that while the Fifth Circuit has not specifically addressed the issue, it "appeared inclined" to allow attorneys' fees even when there is no evidence that the creditor (represented by the attorney) had any claim under § 503(b)(3).  *Id.* (citing *Hall Fin. Group, Inc. v. DP Partners, Ltd. P'ship (In re DP Partners Ltd. P'Ship)*, 106 F.3d 667 (5th Cir. 1997)).  While limiting administrative expenses is a proper congressional goal, Congress "does not do so by setting arbitrary lines which would hang the decision upon whether a creditor recovers tens of thousands of dollars of attorney's fees on whether the creditor incurred the expense of a stamp." *Sedona Institute*, 220 B.R. at 79.  The court noted that while other provisions of the Bankruptcy Code result in disparate treatment for similarly situated parties, each of those provisions is related to and critical to the objective of the statute.  *Id.* at 79–80 (addressing examples of disparate treatment of parties from time limitations

for preferences and fraudulent conveyances and the number of creditors required to file an involuntary petition).  The court stated that it believed that professional fees were excluded from § 503(b)(3) "not to require that the creditor incur an expense in addition to attorney's fees and costs, but rather to channel those professional's fees through the additional standards of (b)(4)— 'reasonable . . . based on the time, the nature, the extent, and the value of such services, and the cost of comparable services . . . ,' there being no express 'reasonable' requirement for nonprofessional expenses incurred by a creditor under (b)(3)." *Id.* at 79.  The majority found no logical reason for disparate treatment for creditors who have made a substantial contribution to the estate due to whether they incurred expenses allowable under § 503(b)(3). *Id.* at 80.

The Western District of Texas addressed the issue and followed the reasoning of the *Sedona* court.  *Am. Plumbing & Mech.*, 327 B.R. at 277–79.  The court also opined that the Fifth Circuit appears to have no issue with an award of attorneys' fees and expenses for applicants, regardless of whether they incurred expenses allowable under § 503(b)(3).  *Id.* at 278 (citing *DP Partners*, 106 F.3d at 674).  The court noted that other bankruptcy courts in Texas have permitted an award of attorneys' fees and expenses without a showing of § 503(b)(3) expenses. *Id.* (citing *In re Datavon, Inc.*, 303 B.R. 119, 122 (Bankr. N.D. Tex. 2003); *In re Speeds Billiards & Games, Inc.*, 149 B.R. 434, 436, 441 (Bankr. E.D. Tex. 1993)).

The Court finds *Sedona* and the opinions of the Texas bankruptcy courts persuasive.  A strict reading would create arbitrary results that neither fulfills the purpose of the statute nor any other valid congressional purpose.  In addition, the Court recalls that Scott Oils' representative(s) were present throughout the confirmation hearing.  They travelled to Lubbock where the hearing was held and obviously incurred expenses doing so.  It strikes the Court as absurd to deny Scott

Oils' (and Kelly Hart's) request simply because Scott Oils elected not to seek an administrative expense claim under subsection (b)(3).

B.

The second threshold issue is whether Kelly Hart—*rather than Scott Oils*—can, in effect, be awarded the requested administrative claim. Though Scott Oils is the party nominally seeking payment of attorneys' fees, the testimony at the hearing was that Scott Oils had not only not paid Kelly Hart's fees but that it is under no obligation to do so.

Michael McConnell, a Kelly Hart attorney, testified that Kelly Hart has not received payment for any of the attorneys' fees requested in the application and that there is no agreement between Kelly Hart and Scott Oils for payment if the Court does not approve this application. Scott Oils has, however, paid the expenses for which reimbursement is sought. Mr. McConnell stated that at the time they decided to file the plan, "[i]t was our expectation and hope that we would be awarded a substantial contribution administrative expense claim for the time and expense we incurred going forward." He stated that while there was no written agreement, the understanding was that Scott Oils would not have to pay these fees and that Kelly Hart would seek these fees through a substantial contribution claim. Audio Recording of Hearing, Aug. 15, 2013, at 1:52:04–1:57:41.

The leading treatise on bankruptcy notes as follows:

> In analyzing a request for compensation, it should be kept in mind that the professional has been retained by the entity rather than by the estate. The professional does not need to seek, nor is the professional able to seek, authorization of the professional's employment under section 327. The terms of the professional's retention are a matter between the professional and its client. While an entity is able to seek reimbursement of its payment obligation from the estate, the granting or denial of an award does not affect the payment relationship between the professional and its client, absent an agreement between them to that effect.

Since section 503(b)(4) refers to the entities described in section 503(b)(3), it would appear that the right to request compensation belongs to the client and not to the professional.

4 Collier at ¶ 503.11[4]. Courts are split on whether professionals may seek reimbursement of expenses on their own behalf and whether the fees must be paid by the client before a § 503(b)(4) request is made. *Id.*

In *In re Olsen*, 334 B.R. 104 (S.D.N.Y. 2005), the court held that a law firm was not authorized to file an application for § 503(b)(4) fees. "The most natural reading of [§§ 503(a), (b)] is that the 'entity' who may file a request for payment under subsection (a) for attorneys' fees under subsection (b)(4) is the same 'entity' whose expense is allowable under subsection (b)(3)(D), i.e., the creditor." *Id.* at 106. Accordingly, the court stated that it was the creditor, not the creditor's attorney, who may submit an application for payment of fees. *Id.* The court acknowledged that in certain instances, it is appropriate to consider the attorney's application to have been made on the behalf of the creditor he or she represents; the intent of this is to allow the court to proceed to the merits of the application without creating more proceedings as a result of a formality. *Id.* The court acknowledged that it is possible to interpret § 503 more broadly, such that an "entity" under subsection (a) might be an entirely different "entity" than the one referenced in subsection (b)(4). *Id.* Such an interpretation would allow a creditor's attorney acting on his or her own behalf to be an "entity" and thus be permitted to seek payment from the estate. *Id.* The court refused to so interpret the statute, noting that such a reading would conflict with the "conventional view that '[c]osts like attorneys' fees are awarded not to the lawyer but to the client.'" *Id.* (quoting *Shula v. Lawent*, 359 F.3d 489, 492 (7th Cir. 2004)). The court considered and rejected the view held in *In re Western Asbestos Co.*, 318 B.R. 527 (Bankr. N.D. Cal. 2004), that an attorney can seek § 503(b)(4) fees even though the attorney's creditor client

has not actually incurred a payment obligation. *Olsen*, 334 B.R. at 107. The court said, "[w]here the creditor has incurred no obligation to pay his attorney, that attorney cannot be said to be seeking fees from the estate 'on the creditor's behalf.'" *Id.*

The Bankruptcy Court of Maine also acknowledged that an attorney is not "within the class of persons authorized to have their expenses allowed as administrative expenses under § 503(b)(3). The application should have been filed by . . . the creditor." *In re Oxford Homes, Inc.*, 204 B.R. 264, 267 (Bankr. D. Me. 1997). The court noted, however, that it is appropriate in certain circumstances to consider the application to have been made on behalf of the creditor to avoid additional proceedings for the sake of formalities. *Id.* at 268. Another court expressed concern that the application was made by the law firm and not its clients, noting that "[o]nly creditors . . . may apply for reimbursement of expenses." *In re Glickman, Berkowitz, Levinson, & Weiner, P.C.*, 196 B.R. 291, 295 n.3 (Bankr. E.D. Pa. 1996) (noting, however, that a firm may file a request for payment of expenses on behalf of its clients).

Other courts have held that an attorney may file an administrative claim for fees and expenses on its own behalf, even when there is no obligation of the creditor to pay fees. In the *Western Asbestos* case, the law firm of Baron & Budd, P.C. represented a number of asbestos claimants with unliquidated claims. 318 B.R. at 529. Two other law firms (collectively, the "Stutzman firm") were hired by Baron & Budd as co-counsel, and it was the fees of the Stutzman firm that were the subject of the application for administrative claim before the court. *Id.* An objection was raised that because the creditors, the asbestos claimants, were represented on a contingency basis, neither the Stutzman firm nor Baron & Budd were entitled to an administrative claim. *Id.* Testimony was given that Baron & Budd hired and paid the Stutzman firm and that Baron & Budd claimed no right to seek reimbursement of those fees from the

asbestos claimants. *Id.* The court reasoned that while subsection (b)(3) requires the expenses actually be incurred, subsection (b)(4) does not require attorneys' fees be *incurred* by the creditor but instead that the attorney who seeks the administrative claim for fees simply must have *represented* a creditor who made a substantial contribution. *Id.* at 530. Accordingly, the court held that a law firm that represented a creditor could seek and obtain an administrative claim for its fees and expenses under § 503(b)(4) even though the actual creditors were not obligated to pay the firm and had not done so. *Id.* at 531–32.

In re Mirant Corp., a case within the Court's district, touched on the issues at hand here. 354 B.R. 113, 140 (Bankr. N.D. Tex. 2006) (Lynn, J.). A shareholder sought fees on behalf of himself and other shareholders under § 503(b)(4). *Id.* The court pointed to *Olsen* as the only authority supporting the debtor's position that the fees must have been paid by the client to be reimbursable and that the applicant itself must be the party seeking the reimbursement. *Id.* The court declined to follow the *Olsen* holding, and instead followed the reasoning of *Western Asbestos* that the language in each of subsections (b)(3) and (b)(4) is distinctly different and does not require the fees be paid before a claim is made. *Id.* The court further found it appropriate to allow an attorney to make a direct application under (b)(4). *Id.* "An attorney or accountant who identifies a potential benefit to a chapter 11 case but whose client is unwilling to absorb the whole cost of pursuing that benefit should not be denied the hope of compensation if he or she is prepared to accept the burden of going forward on the client's behalf." *Id.* The court held that § 503(b)(4) permits attorneys and accountants to directly apply to have fees and expenses paid by the estate as long as they represent a party enumerated in subsection (b)(3). *Id.*

In the present case, Mr. McConnell testified that Scott Oils not only has not paid any of the fees but is under no obligation or agreement to pay the fees in question. Accordingly, while

the application is styled as though it is the application of Scott Oils seeking reimbursement, in reality the application is made by Kelly Hart on its own behalf.

The situation before the Court is novel. Few cases delve into the underlying issue here of whether there must be an obligation of the client to pay the fees. The facts here are distinguishable from that in *Western Asbestos*. In *Western Asbestos*, the clients were not obligated to pay the Stutzman firm's fees, but Baron & Budd was obligated to pay the Stutzman firm and could potentially be compensated for all its work and services by the clients under the contingency agreement. Perhaps, as the *Western Asbestos* and *Mirant* courts noted, the distinctions between the two provisions, (b)(3)(D) and (b)(4), are important. Section 503(b)(3)(D) requires *incurrence* of expenses by the creditor seeking reimbursement. Section 503(b)(4), on the other hand, contains no explicit requirement of incurrence of legal fees by the creditor; it simply refers to the *rendering* of legal services. The Court takes an even simpler approach. The statute provides that an "entity" may request an administrative expense. 11 U.S.C. § 503(a). It then provides that "there shall be allowed administrative expenses" (11 U.S.C. § 503(b)) for "reasonable compensation for professional services rendered by an attorney . . . and reimbursement for . . . expenses incurred by such attorney . . . ." (11 U.S.C. § 503(b)(4)). Kelly Hart is an entity, 11 U.S.C. §§ 101(15), (41); the (b)(4) "entity" need not be the (b)(3)(D) "creditor." The Court concludes that Kelly Hart properly seeks allowance of its fees and expenses here and, provided its services made a substantial contribution, may be awarded an administrative claim.[3]

---

[3] This reading of the statute does not square with what some courts have considered as the overarching scheme of § 503(b)(3)–(4), which is to *reimburse parties* who have made a substantial contribution. Nor does this interpretation line-up with the "conventional view that '[c]osts like attorneys' fees are awarded not to the lawyer but to the client." *See Olsen*, 334 B.R. at 106.

III.

A.

Having resolved the threshold issues in Kelly Hart's favor, the Court turns to whether Kelly Hart's requested fees and expenses should be allowed as an administrative claim.  Again turning to the language of the statute, the Court construes it to require that allowable fees for services are for only those services—for its creditor-client—that provided a substantial contribution in the chapter 11 case.  Such construction does not necessarily follow from a strict reading of subsections (b)(3)(D) and (b)(4) of the statute, however.  As with its discussion above regarding the threshold issues, the Court acknowledges that the two provisions, considered literally, require that the (b)(3)(D)-creditor make the substantial contribution and is then reimbursed per (b)(4) for its payments to its attorneys for their services, provided the amount is reasonable.  *The creditor* makes the substantial contribution.  Having allowed for a more generous construction of the statute, however, the Court must, by necessity, assess whether *counsel's services* provided a substantial contribution.  As all services by Kelly Hart were performed for and at the behest of Scott Oils, a determination of whether any portion of such services made a substantial contribution fuses with the question of whether Scott Oils made a substantial contribution.

B.

Services that provide a substantial contribution to an estate are those that "foster and enhance, rather than retard or interrupt the progress of reorganization."  *DP Partners*, 106 F.3d at 672 (quoting *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986)).  A substantial contribution is one that is "considerable in amount, value or worth."  *DP Partners*, 106 F.3d at 673.  A "self-deprecating, altruistic intent as a prerequisite to recovery of fees and expenses

under section 503" is not required, however. *Id.* A creditor's motive for actions taken has little relevance to the substantial contribution determination. *Id.*

Advance notice is not, technically, a requirement of filing a substantial contribution claim. *Id.* at 672. A party must request administrative fees and expenses within any bar date for such claims and nothing further is required under this circuit's case law. *Id.*

While the Fifth Circuit felt development of a more concrete standard for substantial contribution was best left to be considered on a case-by-case basis, it did state that, at a minimum, the court in question should

> weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions. Benefits flowing to only a portion of the estate or to limited classes of creditors are necessarily diminished in weight. Finally, to aid the district and appellate courts in the review process, bankruptcy judges should make specific and detailed findings on the substantial contribution issue.

*Id.* at 673. "Failing to show a direct, significant and demonstrable benefit to the estate caused by the actions of the applicant is . . . fatal to a substantial contribution claim." *In re Asarco LLC*, No. 05-21207, 2010 WL 3812642, *7 (Bankr. S.D. Tex. Sept. 28, 2010).

These claims should not be granted except in unusual or rare circumstances. *Am. Plumbing & Mech.*, 327 B.R. at 279. A narrow construction is consistent with the general principle that priority statutes, like § 503(b), should be "strictly construed to preserve the estate for the benefit of creditors." *Id.* Activities of creditors that are "ordinary, expected, routine, or duplicative do not constitute a substantial contribution to a debtor's estate." *Asarco*, 2010 WL 3812642, at *8. An applicant must show a causal connection between its services and the substantial contribution, and mere conclusory statements will not suffice. *Id.* Further, an applicant must show that the asserted contribution would not have occurred without their involvement. *Id.*

Courts have employed a variety of factors, as enumerated in *In re Mirant*. 354 B.R. at 132–35. The factors generally considered are

> (1) whether the services involved in the contribution provided a benefit to the estate; (2) whether the services involved in the contribution were undertaken just for the applicant alone or for the benefit of all parties in the case; (3) whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy estate; (4) whether the benefit conferred through the applicant's contribution exceeds the cost which the applicant seeks to assess against the estate; (5) whether the efforts of the applicant were duplicative of efforts undertaken by statutory fiduciaries; (6) whether the applicant profited from the situation or rather faced substantial loss if it had not undertaken the approach that it did; and (7) whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion which caused the debtor to incur costs or which delayed resolution of the case.

*In re Energy Partners, Ltd.*, 422 B.R. 68, 80 (Bankr. S.D. Tex. 2009) (citing *Mirant*, 354 B.R. 113).

The first factor considered by the Court is whether the services provided a benefit to the estate. Scott Oils claims its services benefitted the estate because it proposed, negotiated, and obtained confirmation of a plan. Application of Scott Oils, Inc. at 13 [Docket No. 888]. Specifically, Scott Oils asserts that no other party offered a plan of reorganization, that through the Plan it resolved claims and obtained a significant allocation of value to the mineral and lien claims, and that it resolved the claim and dispute with the Ardinger Group, and therefore, it "provided the key spark that ignited the engines of consensual confirmation negotiations and doused the flames of enormous legal fees and expenses that the Debtor's estate would have otherwise incurred." *Id.* (quoting *Energy Partners*, 422 B.R. at 81).

While Scott Oils did eventually obtain confirmation of the Plan, the road to that point was not the picture of consensual negotiations that Scott Oils presents. The initial proposal presented by Scott Oils was to purchase the Debtor's assets for a purchase price of $1 million. After

stalled negotiations, Scott Oils filed its first plan [Docket No. 528], which was met with numerous objections to the disclosure statement.

Scott Oils then sought to achieve a settlement of the Ardinger Group's claims, which were under investigation and prosecution by the Trustee. A settlement with the Ardinger Group was reflected in the First Amended Plan [Docket No. 591], which provided for a $2 million payment from the Ardinger Group and a withdrawal of $41 million of their claims in exchange for a release of all claims by the estate and confirmation of the ownership of certain mineral interests.

Eventually, the Trustee filed his motion seeking to sell the mineral assets to a third party for $2,656,665, which led to Scott Oils raising its offer to match the competing offer. During confirmation, Scott Oils modified its amended plan multiple times, ending with an offer of $3,406,655.

While a benefit was created by securing a confirmed plan, the contentious process required the statutory fiduciaries to expend time and fees objecting to the various plans, seeking out other buyers, and fighting confirmation. Further, many of the services performed by Scott Oils were "ordinary, expected, and routine" actions taken by a potential purchaser and creditor. In addition, claiming the settlement with the Ardinger Group as a benefit created solely by Scott Oils is misguided. A settlement is not a unilateral decision to be credited to one party, and it would be inappropriate for every party who entered into a settlement in a bankruptcy case to be awarded fees for such negotiation under § 503(b)(4). *See Am. Plumbing & Mech.*, 327 B.R. at 280 n.4.

This factor weighs slightly in support of Scott Oils' application.

Next, the Court determines whether the services involved were undertaken just for the applicant alone or for the benefit of all parties in the case.  A potential purchaser naturally seeks to obtain certain assets at the lowest price possible.  The Fifth Circuit has made it clear that a "self-deprecating, altruistic intent" is not required. *See DP Partners*, 106 F.3d at 673. Regardless of motive, a purchase of assets may still result in a benefit to all parties or to a class of creditors.  While Scott Oils was surely acting with self-interest, the Plan confirmed by the Court did result in a benefit to the creditors as a whole.

Third, whether the applicant would have undertaken the same approach absent the expectation of compensation from the bankruptcy court is considered.  This factor should only be given moderate weight as any party hoping to apply for administrative priority under § 503(b) must surely realize that there is no guaranty of such an application being granted; they merely have a hope.  *See Mirant*, 354 B.R. at 133.  Mr. McConnell's testimony before the Court was, "[i]t was our expectation and hope that we would be awarded a substantial contribution administrative expense claim for the time and expense we incurred going forward."  He stated that the understanding was that Scott Oils would not have to pay these fees and that Kelly Hart would seek these fees through a substantial contribution claim.  Kelly Hart was aware that obtaining an administrative priority claim for fees was not a guarantee.  Scott Oils and Kelly Hart, nevertheless, proceeded to obtain confirmation of the Plan without knowing whether the Court would grant a future § 503(b)(4) application.

Fourth, the Court reviews whether the benefit conferred exceeds the cost the applicant seeks to assess against the estate.  While it is undoubtable that Scott Oils ultimately obtained confirmation of the Plan in the case at bar, it is less clear the degree to which this provided a benefit to the estate.  The efforts to obtain a third-party buyer and the objections of the Trustee

and the Committee were certainly a substantial force in the increase of the purchase price from Scott Oils' initial proposal to the final plan that was approved by the Court.  These efforts were made at no small cost to the estate.  While the Plan confers a benefit on the estate, the benefit must be weighed against the cost the estate bore to raise the value of Scott Oils' offer.

The increased value from Scott Oils' original proposal to the offer confirmed in the Plan is not attributable solely to Scott Oils, but instead is also credited to the Trustee, the Committee, and the Ardinger Group, who agreed to settle their claims.  Without the actions by these parties, the benefits claimed by Scott Oils would have been drastically lower or unattainable.

Factoring in the costs of the Trustee and of the Committee fighting to increase the value obtained by the estate and the amount Scott Oils seeks for Kelly Hart's fees, the benefit to the estate is significantly reduced.

Fifth, whether the services were duplicative of those performed by statutory fiduciaries is considered.  Scott Oils essentially claims that because they were the only party to propose a plan of reorganization, none of their efforts were duplicative of any other party's efforts.  Some efforts were certainly not duplicative.  Scott Oils prepared a plan and disclosure statement, prepared the solicitation of votes, and paid expenses associated with solicitation.  These expenses were not duplicative and certainly were beneficial to the estate.  Other expenses claimed by Scott Oils, however, were duplicative or were services that any potential buyer of assets would engage in, and therefore, should not be given administrative priority status.  For instance, analysis of the debtor's assets and liens and claims and amounts are actions that any potential buyer would undertake.

Sixth, the Court evaluates whether the applicant profited from the situation or faced a substantial loss if it had not taken the approach it did.  After initially approaching the Trustee

about the acquisition of the Debtor's assets without immediate success, Scott Oils had to propose its own plan as a method to achieve the purchase. Scott Oils chose to become involved with the Debtor (becoming a creditor of the Debtor by purchasing existing claims) and sought to make a profit from its involvement and purchase of the Debtor's assets. In *Mirant*, the court noted that one applicant was "not such a sympathetic applicant. It *chose* to become involved with a bankrupt entity; if Phoenix expended funds to make that involvement profitable, it is more properly a cost of doing business for Phoenix than a charge to be borne by creditors and shareholders generally." *Mirant*, 354 B.R. at 135. The court noted that while this was not dispositive of Phoenix's application, it was "a factor which must necessarily chill any impulse toward generosity." *Id.*

Last, the Court addresses whether the applicant had a negative effect on the case, such as making questionable objections to pleadings filed by the debtor or engaging in improper conduct in some other fashion, resulting in the debtor incurring costs of which delayed the resolution of the case. As the Court has previously referenced, the final confirmed plan was a result of an hard-fought battle between the parties, which ultimately resulted in Scott Oils raising their proposed purchase price by a substantial amount. Though a plan was ultimately confirmed, it was a far cry from the original offer to purchase assets from the Debtor. The proposed purchase price increase and the additional efforts to obtain the Ardinger Group settlement were a result of objections filed by the statutory fiduciaries of the Debtor. While there is nothing improper about Scott Oils putting forth a fight to acquire assets for the lowest possible price, the creditors as a whole should not bear the ultimate cost incurred by both Scott Oils, who was seeking to purchase assets for the lowest amount possible, and the statutory fiduciaries, who were acting under a duty to maximize the value of the estate.

The potential cost of Scott Oils obtaining an administrative claim for fees leaves far less for the creditors in this case than anticipated by the disclosure statement or during the hearing on confirmation of the Plan. While, as noted above, the Fifth Circuit has held that advance notice of a substantial contribution claim is not required, *see DP Partners*, 106 F.3d at 672, the omission of the substantial contribution claim here is troubling. Mr. McConnell testified that from the time Scott Oils decided to file a plan, Kelly Hart anticipated filing a substantial contribution claim (it was in fact their only method of anticipated payment). Despite this, neither the disclosure statement nor the Plan mention the claim. The disclosure statement identifies the four other administrative claims of professionals and the estimated amounts for each. *See* Disclosure Statement at 15–17 [Docket No. 650]. The Plan defines administrative claims as including claims under § 503(b) and sets forth procedures for seeking "[f]ee [c]laims" that include those made under § 503(b). If not technically required, disclosure of Kelly Hart's fees and expenses, perhaps as estimated, should have been made.

In the somewhat analogous circumstance of potential claims by the bankruptcy estate— i.e., the debtor, the trustee, or a representative of the estate—against creditors, the Fifth Circuit has held that a chapter 11 plan must provide "specific and unequivocal" notice of retention of any such claims. *In re United Operating, LLC*, 540 F.3d 351, 355 (5th Cir. 2008). This requirement is based on a specific statutory provision, § 1123(b)(3)(B), and is therefore arguably distinguishable. But a purpose of the provision and its requirement is to provide notice to creditors who will be voting on whether to accept the plan. "A claim with potential is a potential asset. The creditors have a right to know what the debtor's assets are even though the potential may be contingent, dependent, or conditional." *Westland Oil Dev. Corp. v. MCorp Mgmt. Solutions, Inc.*, 157 B.R. 100, 103 (S.D. Tex. 1993).

While there is no statutory provision that requires specific disclosure of the administrative claim sought here by Scott Oils and Kelly Hart, the general requirements of disclosure certainly do. Within the priority scheme of the Bankruptcy Code, administrative claims are paid before unsecured creditors. Any disclosure statement and plan that provides for an orderly liquidation, as here, should inform creditors "what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *See* 7 Collier on Bankruptcy 1125.02[1]. More to the point, any disclosure statement regarding such a plan should provide "an estimate of all administrative expenses, including attorney's fees and accountant's fees." *Id*. at 1125.02[2]. The failure to disclose the requested fees here at the confirmation stage clearly runs afoul of the most basic standard of disclosure for a chapter 11 plan. The problem here, of course, is that the disclosure statement and Plan are already approved and the Plan is under implementation. It is difficult to view such omission as anything less than intentional. Such actions work against the trust creditors should be entitled to have in a disclosure statement and plan. While this is not determinative of the substantial contribution claim, the Court views this as "a factor which must necessarily chill any impulse toward generosity." *Mirant*, 354 B.R. at 135.

## C.

On balance, in light of certain services provided by Kelly Hart, as counsel for Scott Oils, it did make a substantial contribution to the case. No objections were raised regarding the time expended or rates charged by Kelly Hart's attorneys. It is reasonable that they should be paid *some amount* for drafting the disclosure statement and plan, soliciting votes, and performing as the plan proponent during the confirmation hearing. While many plans require modifications, Kelly Hart has a less persuasive argument that they are entitled to the full fees for plan

modifications and negotiations; Scott Oils' ultimate goal was to keep the purchase price as low as possible, causing the Trustee and the Committee to fight for the assets to be sold at what they considered to be a fair value. It goes against the spirit of § 503 to have the estate pay for both sides of the fight for confirmation when the parties had opposing goals, with only one side directly seeking to increase the value of the estate. Further, fees for negotiating a settlement of the Ardinger Group's claims are inappropriate for a § 503(b) claim. The settlement is not directly attributable to Scott Oils, as all parties involved had to agree, yet they do not all seek, nor should they all be entitled to, substantial contribution claims. Last, services that a buyer typically undertakes, such as asset and lien analysis, do not warrant an administrative expense claim.

IV.

The application sets forth the time spent and corresponding charge for certain categories of services, which are set forth as follows: plan of reorganization – 248.95 hours and total fees of $81,156.25; plan modifications – 68.30 hours and fees of $19,705; asset and lien analysis – 92 hours and fees of $28,530; claim objections and analysis – 50.20 hours and fees of $14,475; disclosure statement – 188.05 hours and fees of $58,968.75; solicitation – 87.30 hours and fees of $24,527.50; settlements and negotiation – 124.10 hours and fees of $43,815; hearing preparations – 257.60 hours and fees of $97,375; discovery – 18 hours and fees of $7,050; research and brief writing – 67.50 hours and fees of $19,747.50; hearings – 117 hours and fees of $41,452.

The application also requests reimbursement of $118,594.47 in expenses incurred by Scott Oils, consisting of $108,193.51 for its retention of two expert witnesses who testified at the confirmation hearing. The Court notes, however, that with respect to this amount, Scott Oils (or

Kelly Hart) has withdrawn the request for reimbursement of the expert witness fees. It therefore seeks $10,400.96 of expenses incurred in connection with solicitation of the Plan, consisting of costs for mailing and outside vendor copying costs.

The Committee and the Trustee challenge the propriety of all of the requested fees and expenses, contending that none of the services properly constitute a substantial contribution to the bankruptcy proceedings. They contend that Kelly Hart's representation of Scott Oils, the purchaser, effectively cuts-off any such claim as all services and results, direct or indirect, flow from Kelly Hart's efforts in achieving Scott Oils' objective. While they concede that Kelly Hart's services need not arise from altruistic motives, they submit that such services must directly benefit the estate. By way of distinction here, they point to the fact that the purchase price by Scott Oils increased not because of Kelly Hart's efforts; instead it increased because of the Committee's and the Trustee's objections and demand of a higher sales price.

Each category set forth above contains a narrative of services provided, some of which the Court finds proper for allowance, some not. The application does not provide an itemization of the time expended and amounts sought for each specific service provided within each category, however. As a result, the Court, in arriving at an award, admits of imprecision. Upon consideration of the request made here by Scott Oils (and Kelly Hart), and in light of the foregoing considerations, the Court determines that the following sums from each category represent services that made a substantial contribution to this chapter 11 case.

| Category | Amount Awarded |
|---|---|
| Plan of reorganization | $50,000 |
| Plan modifications | $10,000 |
| Asset and lien analysis | $12,000 |

| | |
|---|---|
| Claim objections and analysis | $8,000 |
| Disclosure statement | $40,000 |
| Solicitation | $12,000 |
| Settlement negotiations | $5,000 |
| Hearing preparation | $15,000 |
| Discovery | $0 |
| Research and brief writing | $12,000 |
| Hearings | $20,000 |
| Post-confirmation services | $5,000 |
| **TOTAL:** | **$189,000** |

In addition, the Court will allow the $10,400.96 in expenses incurred in connection with solicitation of the Plan. This does not end the Court's assessment, however. As the Court has determined that Scott Oils' and Kelly Hart's failure to provide notice of the claim made here "chill[s] any impulse toward[s] generosity," such effect must have meaning. The Court, therefore, reduces the substantial contribution claim by 25%. The resulting, allowed substantial contribution claim is $149,550.72.

### End of Memorandum Opinion ###